# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4461 | **DATE** | 3/20/2001 |
| **CASE TITLE** | USA vs. CITY OF CHICAGO HEIGHTS | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 24 APR 01 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant's motion to strike is denied, plaintiff's motion for partial summary judgment is granted, and defendant's motion for summary judgment is denied. There being no just reason for delay, judgment is entered in favor of plaintiff and against defendant on its reasonable accommodation claim and on its challenge to the defendant's 1998 Zoning Code. Defendant is permanently enjoined from forbidding Thresholds to build its group home at its desired location, 619 W. 15th Street in the City of Chicago Heights.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 2 1 2001 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 3/20/2001 | |
| | | date mailed notice | |
| JS | courtroom deputy's initials | JS | |
| | | mailing deputy initials | |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 C 4461 |
| | ) | |
| CITY OF CHICAGO HEIGHTS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |



## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff, the United States of America ("the Government"), brought this action against

defendant, the City of Chicago Heights ("the City"), under the Fair Housing Act, as amended, 42

U.S.C. § § 3601 et. seq. ("FHAA"), seeking declaratory and injunctive relief, as well as

compensatory damages and the imposition of a civil penalty. The Government brings this action on

behalf of Thresholds, Inc. ("Thresholds"), an Illinois corporation which establishes and operates

group homes for persons who suffer from mental illness. The Government alleges that: (1) the City

intentionally discriminated against Thresholds' proposed residents on the basis of their handicap,

mental illness, by refusing to grant Thresholds a special use permit in violation the FHAA

("intentional discrimination claim"); (2) the City violated the FHAA by failing to make a reasonable

accommodation in its zoning laws to allow Thresholds to locate within 1,000 feet of another alleged

"community family residence" ("reasonable accommodation claim"); and (3) the City's new Zoning

Code, enacted the same day the City denied Thresholds' request for a special use permit, December

1

21, 1998, violates the FHAA on its face ("1998 Zoning Code claim").

The Government filed suit against the City pursuant to § 3614(a) of the FHAA, which provides that the Attorney General is authorized to commence a civil action in a United States district court "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance." 42 U.S.C. § 3614(a). The Government has filed a motion for partial summary judgment on its reasonable accommodation and 1998 Zoning Code claims. The City filed a cross-motion for summary on the same two claims, plus a motion for summary judgment on the Government's intentional discrimination claim. The City also filed a motion to strike selected portions of the Government's evidence submitted in support of its motion for summary judgment. For the following reasons, the City's motion to strike is DENIED. The Government's motion for partial summary judgment is GRANTED in its entirety, and the City's motion for summary judgment is DENIED in its entirety.

## STATEMENT OF FACTS[1]

I.   Background

Thresholds is an Illinois non-profit corporation accredited by the Commission on Accreditation of Rehabilitation Facilities and licensed with the Illinois Department of Human Resources. Thresholds is in the business of providing psycho-social services to individuals with mental illness, including schizophrenia, bipolar disorder, and major depression. Defendant, the City

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) and 56.1(b) statements of material facts and accompanying exhibits.

of Chicago Heights, is a municipality located in Cook County, Illinois, and organized under the laws of Illinois. Chicago Heights exercises zoning and land use authority over land within its boundaries.

Thresholds' primary goal is to integrate persons with serious mental illness into the community. Thresholds provided rehabilitative help to its clients, helping them to learn social skills, to resume their education, to live independently, and to go back to work. Thresholds treats between 6,000 and 7,000 persons annually from approximately 24 branches in the Chicago area. One way in which Thresholds provides these services is by establishing group homes and other residential settings in which persons with mental illness can live, aided by professional staff. Thresholds' group homes provide a supportive, family-like atmosphere to aid in the transition to community living.

Dr. Thomas Simpatico, the Government's expert witness, is Chief of the Bureau of Chicago Network Operations for the Illinois Department of Human Services, Office of Mental Health. Dr. Simpatico testified at his deposition to the prevalence of mental illness and that "group homes offer an ideal environment in which to help people anticipate and overcome the obstacles encountered in everyday living while fostering the greatest possible degree of autonomy." The group home is often the only appropriate treatment setting for persons for whom the hospital represents too restrictive of an environment but who are not well organized enough for independent living. Dr. Simpatico opined that "group homes are necessary for the successful treatment of persons with serious and persistent mental illness." Dr. Simpatico testified that he is aware of the location and concentration of all Office of Mental Health funded resources, and that group homes are badly needed in the south suburbs of Chicago, including Chicago Heights. Dr. Simpatico based his opinion on his knowledge of epidemiological data regarding serious and persistent mental illness and knowledge of the current levels of systems funding for mental health services. In particular, Dr. Simpatico testified that the

3

Office of Mental Health funds only three group homes located in the City, one with an eight-person capacity, and two with a four-person capacity. Dr. Simpatico also testified that there is a need for residential services for more than sixteen persons with serious mental illness in Chicago Heights.

The National Association of the Mentally Ill ("NAMI"), South Suburbs, is a parent group who wanted housing for their own children in the south suburbs. At the time Thresholds sought to locate a group home in the south suburbs of Chicago, NAMI was in partnership with Thresholds in providing services for persons with mental illness. In particular, NAMI wanted housing that serviced their towns, one of which was the City. The president of NAMI wrote a letter to Angelo Ciambrone, the City's mayor, telling the Mayor Ciambrone that the Thresholds' project would benefit the City.

II.    1972 Zoning Code

The City's land use and zoning regulations are contained within the City of Chicago Heights Zoning Code. At the time Thresholds submitted its request for a special use permit and the City denied that request, the 1972 Zoning Code was in effect. The group home provisions in the City's 1972 Code were the result of an amendment enacted on October 15, 1990. For the sake of simplicity, this court refers to the Zoning Code under which Thresholds' special use permit was denied as the "1972 Zoning Code." The 1972 Zoning Code was amended on December 21, 1998. That new 1998 Zoning Code is also at issue in this litigation. Again for the sake of simplicity, this Court refers to that Code as the 1998 Zoning Code.

The purposes of the group home provision of the 1972 Code were stated as part of the 1990 amendments in a series of "Whereas" clauses. Those clauses are as follows:

WHEREAS, it has been shown that large numbers of people with disabilities need to live together in community residences with support staff as a functional family to be enabled to live within the community and not be inappropriately forced to live in an institution or nursing home;

WHEREAS, community residences for persons with disabilities are often the only way large numbers of people with disabilities can be enabled to live within the community;

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WHEREAS, the national Fair Housing Amendments Act of 1988 (102 U.S. Stat. 1619) prohibits discrimination in housing against persons with handicaps or disabilities;

WHEREAS, community residences for persons with disabilities is a residential use and should be allowed in all areas of the municipality where other residential uses are permitted;

WHEREAS, over 40 research studies of the impacts of community residences for people with disabilities find that such residences generate no adverse impacts on the surrounding communities so long as they are licensed and not clustered on a block.

WHEREAS, it is necessary to prevent clustering of community residences on a block in order to facilitate normalization, one of the main functions of a community residence, and preserve the residential character of the neighborhood.

To that end, a "family community residences" was permitted to locate in a single-family district if it obtained a Certificate of Occupancy.

The City's 1972 Zoning Code differentiated between "families," "community family residences," and "group community residences." The 1972 Zoning Code defined "family" as:

one or more persons related by blood, marriage or adoption, or a group of not more than five (5) persons (excluding servants), who need not be related by blood, marriage or adoption, living together and maintaining a common household . . .

The 1972 Zoning Code defined "family community residence" as:

5

a single dwelling unit occupied on a relative permanent basis in a family-like environment by a group of not more than eight (8) unrelated persons with disabilities, plus paid professional staff provided by the sponsoring agency, either living with the residents on a twenty-four hour basis, or present whenever residents with disabilities are present at the dwelling; and complies with the zoning regulations for the district in which the site is located.

"Group community residences" were defined identically to "family community residences" except that they were homes of between nine and fifteen people. Pursuant to the 1972 Zoning Code, family community residences were permitted uses in single-family residential zones provided they received a certificate of occupancy. To receive a certificate of occupancy, community residences were required to meet two requirements: (1) that the group home be "located at least one thousand (1,000) feet from any existing community residence . . . except when a special use permit is issued to allow a community residence to locate closer than one thousand (1,000) feet to an existing community residence, and (2) the community residence demonstrates that it either obtained or is eligible for licensing or certification required by the state of Illinois to operate the residence. A family community residence that met these requirements could locate in a single-family residential zone as of right. If a community residence did not meet these requirements, that is, if it were located within 1,000 feet of an existing community residence, a special use permit was necessary under the 1972 Zoning Code. "Group community residences" could locate in single-family zones only if they obtained special use permits, regardless of their distance to other group homes.

The 1972 Zoning Code set forth the authorization required for a special use permit. It provides that the City Council alone has the authority to grant or deny an application for a special use permit. The 1972 Zoning Code further provided that for each application for a special use permit, the Zoning Board of Appeals ("ZBA") "shall report to the city council its findings and

recommendations." That Code provided that "prior to submitting its report to the city council the zoning board of appeals shall review the report of the plan commission and give due consideration to the plan commissions' findings and recommendations. The 1972 Zoning Code provided that the ZBA shall keep minutes of its proceedings and that "findings of fact shall be included in the minutes of each case and the reasons for granting or denying each application shall be specified." The 1972 Zoning Code also set forth the standards the ZBA must use in determining whether or not to recommend the granting of a special use application. The ZBA is a seven-member board appointed by the mayor and the City Council. The Plan Commission is a nine-member board, appointed by the mayor.

III.    Thresholds Seeks to Locate in Chicago Heights

Beginning in the Spring of 1995, Thresholds expressed an interest in locating in Chicago Heights, particularly at 619 West 15th Street, to Joseph Christofanelli, the former City Planner. On May 30, 1995, Christofanelli wrote to Thresholds that the property "is currently zoned as a R-1 Single Family Residence District," and that the zoning classification is appropriate for a family community residence. On November 9, 1995, Thresholds entered into an option to purchase agreement for the property at 619 West 15th Street. On August 1, 1995, Thresholds purchased the property. The application for HUD section 811 funding required, among other things, that Thresholds engage an architect and engineer, obtain working drawings and specifications for the proposed group home, conduct environmental testing on the site, prepare a survey, obtain a contractor, and have that contractor prepare a cost breakdown for the project. Thresholds submitted its application for HUD funding on July 7, 1997. At various times in 1996 and 1997, Thresholds communicated with the City employees in the water, building, and fire departments regarding sewer

7

hook-ups and inspection for the proposed group home.

On November 24, 1997, Christofanelli informed Thresholds by letter that its proposed construction of a family community residence "is denied due to another family community residence located at 662 West 14th Place." Christofanelli stated that the existing family community residence at 662 West 14th Place was within 1,000 feet of the 15th Place property and cited the 1,000 feet spacing requirement for community residences. Christofanelli's letter was the first time Thresholds became aware that there was another facility within 1,000 feet of the 15th Street property.

On May 21, 1998, Thresholds submitted a special use permit application to the City requesting a waiver of the spacing requirement to permit it to construct and operate a group home for eight adult persons with mental illness and a professional staff member. In making the request, Thresholds asked the City to make a "reasonable accommodation" for people with disabilities, who would reside there, as set forth in the Fair Housing Act Amendments of 1998, 42 U.S.C. § 3604(f)(4)(B). Thresholds included, among the attachments to the application, a copy of the warranty of deed showing that it had purchased the property at 619 West 15th Street. Thresholds' special use permit application was the first application the City had ever received requesting a waiver of the City's spacing requirement under the 1972 Zoning Code.

Thresholds' application for a special use permit was sent to the City Council. On June 1, 1998, the City Council sent the application to the Zoning Board of Appeals ("ZBA") for a public hearing. At a July 1, 1998 public hearing, Christofanelli stated that Thresholds' proposed site was within approximately 450 to 500 feet of another family community residence. Thresholds was represented by Julia Rupp, its Director of Administration, Mary Lang Antilotti, Program Director for Thresholds South Suburbs, and Don Pyles, a member of Thresholds' Board of Directors, at the

8

July 1, 1998 meeting. Rupp described Thresholds as serving people with mental illness for the past 35 years, and stated "[w]e're probably the largest provider and one of the most respected nationally." Rupp described the operation of the proposed group home: it would serve adults with mental illness, would be supervised -- trained staff would be present whenever residents were present and there would be a a live-in staff person, and the residents would be required to attend some kind of structure during the day, such as work or work adjustment training. Rupp further testified that 99% of the residents take medication for their illness, that medication was a very important part of the program, and that the resident staff monitors the taking of medication. Rupp stated that Thresholds tries to move people into the home that are from the area, that Thresholds already serves people from the Chicago Heights area at a day program, and that NAMI wanted housing in the area for their family members that live here. Rupp also explained that Thresholds had been told by Christofanelli that the land was properly zoned for a group home before purchasing the property, that the building would be paid for with money from HUD, that the process of obtaining money from HUD is very long, and that Thresholds was not told of the other home until it had a contractor and was ready to start the project. Rupp also addressed concerns over density of group homes, explaining that Thresholds wants "to be integrated in the community . . . one of the things we like about our community is diversity and integration." Rupp explained that the 14th Street home had only three residents, and that they had different disabilities than Thresholds' proposed residents. Rupp also answered concerns that the residents would be violent, explaining that Thresholds is very assertive about making sure that persons are stable and able to stay in the community before they are accepted by Thresholds and that Thresholds always gets along very well with its neighbors.

The Plan Commission held a meeting on July 29, 1998. Thresholds was again represented

by Rupp, Lang-Anzilotti, and Pyles. There, Thresholds provided an overview of the program and described its proposed residents. Thresholds explained that it had applied for HUD funding and that it takes a long time to get that funding in place. Thresholds requested that the City make a reasonable accommodation as outlined in the FHAA. Community residents appeared at the meeting and spoke against the Thresholds application. Christofanelli estimated that there were 25 to 30 people present in the audience, which was more than the norm. Six people from 15th Street and 16th Place spoke to the Commission, stating that they worried about encroaching negative influences, including crack houses and drug dealers, and that a community residence would be another negative influence that would lower the property value of their homes. Rupp assured the audience that their property values would not go down, and that she would provide research studies if anyone wanted to see them. At the end of the July 29, 1998 meeting, the Plan Commission voted unanimously to recommend that the City Council deny Thresholds' application for a special use permit. Christofanelli testified that any deliberation over a special use permit application occurs at the formal meetings of the Plan Commission. One member of the Plan Commission testified that there was no discussion among the members of the Plan Commission as to how they would vote before the vote. The Plan Commission minutes for the meeting do not set forth any reasons for recommending that the Thresholds application be denied. The recommendation of the Plan Commission is set forth in a letter dated December 2, 1998. That letter recommended denial of the application and contained no findings.

A ZBA meeting was held August 19, 1998 to discuss Thresholds' application for special use permit. Thresholds' application was tabled, but community residents were present and permitted to speak against the application. Those residents who spoke stated that they supported the 1,000 foot

spacing requirement. The residents were informed that they could take the issue up at the next scheduled meeting of the City Council, August 24, 1998. The residents did appear at the City Council meeting and voiced their objection to Thresholds' application, although the matter was not on the agenda. At a September 23, 1998 meeting of the ZBA, the application was again tabled.

At an October 21, 1998 meeting between representatives of the United States Attorney's Office and Christofanelli and City Corporation Counsel August Anzemlo, the City offered to exchange the property Thresholds owns at 619 West 15th Street with another parcel of land elsewhere in the City. Thresholds rejected the offer because of worries that it would delay the project by a minimum of two years.[2] Thresholds' Executive Director, Dr. Jerry Dincin, testified that he had once before agreed to trade sites in the City of Chicago and as of August, 2000, five years had gone by and the Thresholds' housing still had not been built. The City offered to do everything in its power to speed up Thresholds' HUD funding if Thresholds accepted the alternate site. The City also offered to assist Thresholds in any way possible with its applications for city permits.

The ZBA met again on December 2, 1998. Thresholds' application was the only item on the agenda. Community residents again appeared at the meeting and presented a petition which contained approximately 144 signatures, urged the City to deny the request from Thresholds, stated that two homes within 500 feet of each other "will overtax the resources of the neighborhood," and stated "[d]ue to the extreme drugs and alcohol in the area, it would be in the best interests of the perspective [sic] occupants and present residents of the neighborhood to build this home in another area." The residents also voiced oral objections to the application, including comments such as "we

---

[2]The City "denied" this fact, but offers no factual support for its denial. It is therefore deemed admitted under Local Rule 56.1(b)(3)(B).

have enough problems." Any deliberation over a special use permit by the ZBA happened at the formal meetings of the ZBA. Christofanelli testified that "chances are" that he told the ZBA how the Planning Commission had voted, that the vote "would be important information for them," that he did not tell the ZBA the reasons for the Planning Commission's vote because the Commission stated no reasons for the vote in its letter, and that he did not recall the ZBA asking for the reasons for the Plan Commission vote. The ZBA voted unanimously at its December 2, 1998 meeting to recommended that the City Council deny Thresholds a special use permit. The recommendation of the ZBA is set forth in a letter dated December 3, 1998. The ZBA made no written findings of fact, nor did it set forth in writing the reasons for its recommendation or the evidence considered by the ZBA in making its recommendation to deny Thresholds' special use permit application.

On December 21, 1998, the City Council met to vote on Thresholds' application. Three City Councilpersons testified that they were given no written findings of fact explaining the basis for the ZBA's recommendation to deny Thresholds' permit. Mayor Ciambrone testified that he did not know the reasons the Plan Commission or the ZBA voted to recommend denying the application. Community residents again appeared and voice opposition to the application; no resident spoke in favor on the application. The comments generally reflected concern over "crazy people" wandering the neighborhoods and devaluing of property in the neighborhood. One alderman asked if there was anyone from Thresholds present. Rupp stated to the Council that Thresholds representatives had attended hearings and answered residents' concerns, had gone to the City three years prior to ensure that it had appropriate zoning, that the project would be paid for by HUD and the funding had taken a long time, that Thresholds was about to break ground when it was informed about the other group home, and that the City's zoning which prevented Thresholds from moving in is against the FHAA.

Rupp then offered to answer any questions. In response, Mayor Ciambrone stated "I think we had the hearing before the Plan Commission and Zoning Board." One alderman asked whether Thresholds' funding would be jeopardized if it did not go forward. Rupp responded that funding was tied to that location, that it was possible to move, but that the process was lengthy and that it would take years to obtain the funding, and that Thresholds had to move a location once before in Chicago and that the funding had been substantially delayed as a result. One alderman requested additional time to study the matter. The Mayor did not respond to that request, but instead called for a roll-call. The City Council voted at the December 21, 1998 meeting to deny Thresholds' application for a special use permit. Three members voted to abstain and the Mayor cast the tie-breaking vote to deny the application.

Joseph Christofanelli is the former City Planner and the head of the City's Planning and Zoning Department. The City designated Christofanelli, pursuant to Federal Rule of Civil Procedure 30(b)(6), as its representative to testify on its behalf regarding the reasons for the December 21, 1998 decision of the City Council to deny the request to grant a special use permit to Thresholds to operate a family community residence at 619 West 15th Street, how the City reached that decision, the facts that support that decision, the persons consulted with reference to that decision, and what documents the City relied upon in reaching its decision. Christofanelli testified that the City Council voted to reject the application because they accepted the recommendations of the Plan Commission and the ZBA. Christofanelli did not testify to any other reason the City Council voted to reject the application. Christofanelli also testified that the City Council was not compelled by law to accept the recommendation of the ZBA and the Planning Commission.

August Anzelmo is and was at all times relevant to this action corporation counsel to the

City. The City designated Anzelmo as its representative, pursuant to Rule 30(b)(6), to testify on its behalf regarding whether the City maintains in this action that granting Thresholds a special use permit to construct its group home at 619 West 15th Street is a reasonable accommodation, and if not, to testify as to any and all reasons the City has for believing that the requested accommodation, a special use permit, is not reasonable or necessary to afford the prospective residents an equal opportunity to use and enjoy a dwelling, the facts which support those beliefs, the persons consulted with reference to whether granting the special use permit is reasonably necessary, and the documents the City relies upon relating to its beliefs on reasonable accommodation. Anzelmo testified that the City does not contend that the operation of the Thresholds group home at 619 West 15th Street would alter the residential character of the neighborhood. Anzelmo testified that the City does not claim that allowing Thresholds to operate its group home on 15th Street would pose a threat or danger to public health, injure or harm others in using their property, substantially diminish or impair property values in the vicinity of the proposed home, or impede surrounding property owners in developing and improving their properties. Anzelmo also testified that the City does not claim that there are inadequate utilities, that there is inadequate off-street parking, or that there would be difficulty with respect to vehicles entering and leaving the proposed home. Anzelmo testified that a financial burden could exist for the City in the form of increased litigation costs arising from other group home providers also seeking exceptions to the spacing requirement, that those costs would be financial and administrative burdens on the City, that Thresholds' location would "wreak havoc" on the City's Zoning Ordinance, and that granting the accommodation would render the dispersal provision "meaningless" because it would open the door for similar requests and create a precedent that would lead to undesirable clustering of group homes.

IV.   The 1998 Zoning Code

On December 21, 1998 the City enacted a new Zoning Ordinance, No. 98-36 (the "1998 Zoning Code"). The 1998 Zoning Code has nine requirements that a "group home" must meet in order to locate in a single-family district. Among the nine conditions required of group homes in the 1998 Code are:

(1)   the use shall occupy a detached single-family dwelling, which is consistent in type and general outward appearance with other residences in the area where it is located;

(2)   the facility shall be operated by a governmental, religious or other non-profit agency;

(3)   occupancy shall not exceed one person per room, meaning a whole room used for living purposes.

(4)   an inspection by the code enforcement department ensures that existing building code requirements for residences are met prior to any occupancy or re-occupancy.

The 1998 Zoning Code defines "group home" as:

a detached, single family dwelling owned and operated by a governmental, religious or other not-for-profit agency occupied on a relatively permanent basis operated as a functional equivalent of a traditional family by a group of not more than eight (8) unrelated persons (inclusive of resident staff) who . . . require assistance and/or supervision, and who reside together as a single housekeeping unit; and, which meets the requirements of all relevant Federal, State, and local codes . . .

The above stated four conditions apply only to group homes. Group residences of greater than eight persons are not allowed even as special uses in single-family zones under the 1998 Zoning Code.

15

V.    The Residence at 662 West 14th Place

Through discovery, the Government found more information about the nature of the 14th Place residence within 1,000 feet of Thresholds' proposed residence upon which the City's denial was based. The residence located at 662 West 14th Street is on a different street than Thresholds' proposed site. Melissa Wright, the Associate Director of the Office of Developmental Disabilities, Illinois Department of Human Services, submitted a declaration which stated that information about the 14th Place home is within her office's data base, of which she has knowledge. From that knowledge, Wright stated that the 14th Place home is a five-person home for people with developmental disabilities in which the clients receive 24-hour "shift staff" as opposed to "foster care" support. The night shift is reported as "awake." The residents of the 14th Place home have a diagnosis of mental retardation; one resident has mild retardation, one has severe mental retardation, and three have profound mental retardation. Two of the five residents are primarily non-ambulatory, and all are restricted in their ability to move around.

Dr. Simpatico visited both the 14th Place home and Thresholds' proposed site, and testified that in his clinical opinion, placing the Thresholds group home at its desired location would not create an institutional environment in that area. Dr. Simpatico's opinion was based on the fact that the two locations are functionally separate and open on to separate streets, on the fact that each home would serve clinically distinct populations, and the fact that the residents at the 14th Street home are profoundly impaired and cannot leave the home unattended. Dr. Simpatico testified that he believed that the distance between the two residences would "in no way compromise[] the treatment of either group."

16

I.  **The City's Motion to Strike Selected Paragraphs of the Government's Rule 56.1(a) Statement of Facts**

The facts, as outlined above, are almost entirely undisputed. However, the City moved to strike some of the Government's facts on the basis that the Government relies upon "new" evidence that was never submitted to the City in Thresholds' special use permit application. In support, the City argues a variety of legal positions. The first argument is that this court may not consider evidence that was not submitted to the City in Thresholds' application for a special use permit. That argument demonstrates the City's fundamental misunderstanding of the nature of this litigation. These cross-motions for summary judgment are not a review of an administrative decision made below, such that this court reviews the City's decision for abuse of discretion and considers only the evidence submitted to the administrative body. Rather, a district court action challenging a zoning decision under the FHAA is a _de novo_ proceeding in which evidence need not have been presented to the defendant or an administrative body in order to be considered. Evidence the City did not consider at the time it decided to deny Thresholds' special use permit may not be relevant to resolving the City's intent, but it is relevant to whether the City failed to reasonably accommodate Thresholds. As such, the Government's evidence that was not previously submitted to the City is no more "new" or irrelevant than any other evidence which is ever obtained through discovery once litigation has begun.

The City cites no authority to support its position that this court is limited to the evidence submitted to it, and this court's research has also revealed no such authority. To the contrary, other district courts have considered evidence which was not considered by the municipal decision-maker.

17

See ReMed Recovery Care Ctr. v. Township of Willistown, 36 F. Supp. 2d 676, 686 n.8 (E.D. Pa. 1999) ("Although ReMed apparently did not present this evidence to the Board, this court is not limited to consideration of the record before the Board and may consider new evidence presented by either party."); see also Stuart Circle Parish v. Board of Zoning Appeals, 946 F. Supp. 1225, 1229 (E.D. Va. 1996) (declining to exercise Younger abstention from federal court because a parallel state court proceeding was generally limited to the record before the Zoning Board of Appeals, while the federal court was not). Moreover, the FHAA and the policy behind the statute all favor the position that this court is not limited to the evidence submitted to the City only. Under the FHAA, the Attorney General is authorized to enforce its anti-discrimination provisions by "commenc[ing] a civil action in any appropriate United States district court." 42 U.S.C. § 3614(a). The statute does not authorize nor require the United States to appear as a party in municipal proceedings. As such, the Government was not a party to the City's zoning action, and therefore should not be limited to the evidence presented there. A contrary result would restrict the Government's ability to enforce the FHAA and would require group homes to hire expensive attorneys and experts to make their records complete at the municipal level.

The City also argues that the Government's "new" evidence violates the principle of judicial estoppel, which bars a litigant who has prevailed in one proceeding from taking the opposite position in a subsequent proceeding. See, e.g., Czajkowski v. City of Chicago, 810 F. Supp. 1428, 1434 (N.D. Ill. 1992). The City's argument is misguided for three reasons. First, the Government was not a party to any prior proceeding in this matter, and therefore has alleged and maintained only one position throughout this controversy -- that the City discriminated against Thresholds in various ways. Second, Thresholds, on whose behalf the Government brought this action, was not the

prevailing party at the municipal level, such that the doctrine of judicial estoppel is not triggered. Finally, even if Thresholds had prevailed at the municipal level, it has maintained a consistent position throughout its involvement with the City. While discovery has fleshed out Thresholds' claims by adding additional evidence to support them, Thresholds has always maintained that the City's refusal to grant it a conditional use permit would constitute a violation of the FHAA. The evidence and arguments submitted by the Government in support of its motion for summary judgment which were not presented to the City are not barred by the doctrine of judicial estoppel.

For the reasons stated, the City's motion to strike is without merit. The opinions, data, and facts relied upon by Dr. Thomas Simpatico and evidence concerning the nature of the group home located at 622 West 14th Place was properly submitted in support of the Government's summary judgment motion and will be considered by this court.

The City also moved to strike evidence of community opposition to Thresholds' proposed special use permit from the Government's 56.1(a) Statement of Uncontested Facts because the Government is not moving for summary judgment on its intentional discrimination claim, so the City's motives in denying the permit are not relevant. The Government submitted the facts "only to show the context in which the City's decision was made," and did not rely upon those facts in its argument section. This court agrees that community opposition is not relevant to the issue of reasonable accommodation, and therefore cannot and will not consider that evidence in ruling on the Government's motion for summary judgment. Evidence of community opposition voiced to the ZBA, Planning Commission, and the City Council is, of course, relevant to the City's motion for summary judgment on the Government's intentional discrimination claim. This court thus will consider evidence of community opposition in ruling on the City's motion for summary judgment

on the Government's intentional discrimination claim.

With those preliminary matters out of the way, this court considers the merits of the parties' cross-motions for summary judgment.

II.    The Government's Motion for Partial Summary Judgment on Reasonable Accommodation and 1998 Zoning Code Claims

While the City moved for summary judgment on the Government's entire complaint, including the intentional discrimination claim, the Government's motion for partial summary judgment is limited to two of its claims: (1) that the City's failure to grant Thresholds a special use permit to operate within 1,000 feet of a residence located at 662 West 14th Street constitutes a failure to provide Thresholds with a reasonable accommodation in violation of the Fair Housing Act, as amended ("FHAA"), 42 U.S.C. § 3604(f)(2)(A) and 3604(f)(3)(B); and (2) that the City's 1998 Zoning Code contains unlawful restrictions on group homes in violation of the FHAA.   The Fair Housing Act declares it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter." 42 U.S.C. § 3604(f)(1)(A).  The Government argues that the City's undisputed actions violate the FHAA, and that the FHAA mandates this court to enjoin those actions.

A.    Reasonable Accommodation Claim

The Government first argues that the City violated the FHAA by relying upon its 1,000 foot spacing requirement for community family residences to deny Thresholds the right to locate at 619 West 15th Street because the other alleged "community family residence," located less than 1,000 feet away at 662 West 14th Place is not a "community family residence" within the meaning of the 1972 Zoning Code.  As such, the Government argues, Thresholds has the right to locate at its

proposed location as a matter of right. In the alternative, the Government argues that the City violated the FHAA by failing to reasonably accommodate Threshold in refusing to grant Thresholds a special use permit to locate at its desired location despite the 1,000 foot spacing requirement.

1. Thresholds' Entitlement to Locate at 619 West 15th Street as a Matter of Right

Under the City's 1972 Zoning Code, as amended in 1990, a "family" was defined as: "five or more persons related by blood, marriage, or adoption, or a group of not more than five (5) persons (excluding servants), who need not be related by blood, marriage or adoption, living together and maintaining a common household." In contrast, "family community residence" was defined in the 1972 Zoning Code as "a single dwelling unit occupied on a relative permanent basis in a family-like environment by a group of no more than eight (8) unrelated persons with disabilities." The "community family residence" located at 662 West 14th Street, less than 1,000 feet from the proposed Thresholds site, is a five-person home in which clients with developmental disabilities receive 24-hour "shift-staff" support, as opposed to "foster care" support. The night shift staff is reported as "awake." As such, the 662 West 14th Place residence fits the definition of "family" as well as the definition of "family community residence" under the 1972 Zoning Code.[3]

---

[3]The City does not deny that the residence at 662 West 14th Place houses five or less persons or otherwise fails to meet the definition of "family" under the 1972 Zoning Code. Nor does the City attempt to justify treating the residence as a community residence rather than as a family. Instead, the City moved to strike the Government's evidence in support of this argument, a declaration signed by Melissa Wright, the Associate Director of the Office of Developmental Disabilities for the Illinois Department of Human Services, on the basis that the evidence was not presented to the City. This court has denied that motion. See Sec. I, infra. Accordingly, the facts are admitted. The City also argues that the argument should not be considered because it was not alleged in the Government's complaint in this litigation. This court finds that the Government was under no obligation to allege this theory in its complaint. The Government's complaint, alleging failure to reasonably accommodate Thresholds' residents, was more than sufficient to meet the requirements of Fed. R.

The Government argues that Thresholds is entitled to locate within 1,000 feet of the 662 West 14th Place residence because it is a "family" within the meaning of the 1972 Zoning Code, and a city may not subject a group home which meets the definition of "family" to conditions which are not imposed on other "families." In support, the Government cites Children's Alliance v. City of Bellevue, 950 F. Supp. 1491 (W.D. Wash. 1997). In that case, the court held that a statute which defined both "family" and "group facility" and specified that if a group home fit within both definitions, the "group facility" characterization controlled, resulting in different treatment for groups on account of their familial status or handicap, was facially discriminatory. Id. at 1497. Here, the Zoning Code does not explicitly state that "family community residence" trumps "family" when a group home meets both definitions. However, the City clearly did choose to label the home at 662 West 14th Place as a "family community residence" rather than as a family, or else Thresholds would not have needed to apply for a special use permit in order to locate within 1,000 feet of it. As such, in practice, under the 1972 Zoning Code, groups of five or less unrelated persons with disabilities are subject to conditions to which similarly situated groups of five or less unrelated persons without disabilities are not. The City offers no justification for treating two groups, identical in size and familial status, differently on the basis of disability. As such, the City cannot treat the residence at 662 West 14th Place as a "family community residence," subject to location restrictions, rather than as a "family," not subject to those restrictions, without violating the FHAA.

Civ. P. 8. Thresholds and the Government were informed by the City that the residence at 662 West 14th Place was a family community residence, and relied upon that representation. The Government now has the benefit of discovery to show that the City's representation was erroneous. Rather than cite to facts or law in support of its position, the City hides behind labels of the Government's argument, calling it "specious," a "mockery of this litigation," and "maddening." Those labels will not suffice to defeat summary judgment.

Accordingly, the residence at 662 West 14th Place cannot legally be considered a "family community residence" within the meaning of the 1972 Zoning Code. As such, there is no evidence that there is a legitimate "family community residence" within 1,000 feet of the proposed Thresholds site, and Thresholds is entitled to locate at its proposed location as a matter of right.

Even if the 662 West 14th Place residence were legitimately considered a family community residence, the City was required to reasonably accommodate Thresholds within its Zoning Code. The City failed to reasonably accommodate Thresholds by denying its application for a special use permit.

2.    The City's Refusal to Grant Thresholds a Conditional Use Permit

Even if the residence at 662 West 14th Place were a legitimate family community residence, thus subjecting Thresholds' proposed site to the 1,000 foot spacing limitation, the City is required to make reasonable accommodations for Thresholds. Discrimination covered by the FHAA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped] person[s] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Both the Supreme Court and the Seventh Circuit have recognized the FHAA's stated policy "to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601, its "broad and inclusive" compass, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731, 115 S. Ct. 1776, 1780 (1995), and its "broad mandate to eliminate housing discrimination against and equalize housing opportunities for disabled individuals, Bronk v. Ineichen, 54 F.3d 425, 428 (7th Cir. 1995).

Cases decided under the FHAA have held or assumed that the Act applies to municipalities, including reasonable accommodations in zoning ordinances. See Hemisphere Bldg. Co. v. Village

of Richton Park, 171 F.3d 437, 438 (7th Cir. 1999) (reasonable accommodation claim against village). It is undisputed that the proposed residents of the Thresholds site are handicapped persons within the meaning of the Act, that Thresholds requested an accommodation from the City in the form of a special use permit in order to enable eight persons with mental illness to live in a group home at 619 West 15th Street, and that the City denied that special use permit. Therefore, the only remaining issue is whether the requested accommodation was both reasonable and necessary. If the requested accommodation was both reasonable and necessary under the undisputed facts, then the Government is entitled to summary judgment on its reasonable accommodation claim.

### a. Necessity of Thresholds' Proposed Accommodation

As stated above, under the FHAA, discrimination includes a refusal to make reasonable accommodations when such accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B). "[T]he concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995). Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice. Smith & Lee Assoc., Inc. v. City of Taylor, 102 F.3d 781, 795 (6th Cir. 1996).

The Seventh Circuit has recognized that for groups of handicapped persons who seek to live together, either for mutual support or to permit full-time care by a staff, joint living arrangements are "essential." Brandt v. Village of Chebanse, 82 F.3d 172, 174 (7th Cir. 1996). The City itself acknowledged the necessity of group homes in enacting its group home ordinance. That ordinance, passed on October 15, 1990 amending the 1972 Zoning Code, recognizes, inter alia:

24

(1) It has been shown that large numbers of people with disabilities need to live together in community residences with support staff as a functional family to be enabled to live within the community and not be inappropriately forced to live in an institution or nursing home;

(2) Community residences for persons with disabilities are often the only way large numbers of people with disabilities can be enabled to live within the community;

(3) Community residences for persons with disabilities is a residential use and should be allowed in all areas of the municipality where other residential uses are permitted; and

(4) Over 40 research studies of the impacts of community residences for people with disabilities find that such residences generate no adverse impacts on the surrounding communities so long as they are licensed and not clustered on a block.

As such, the City itself has acknowledged that granting a special use permit to allow Thresholds to operate a group home "will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." See Bronk, 54 F.3d at 429.

The Government also submitted extensive evidence demonstrating the need for facilities like Thresholds in the south suburbs of Chicago and Chicago Heights in particular. The National Association for the Mentally Ill, South Suburbs ("NAMI"), a group of parents of mentally ill persons, identified a need to bring housing for their children in that area. Dr. Simpatico, Chief of the Bureau of Chicago Network Operations for the Illinois Office of Mental Health, testified that group homes are needed in the south suburbs of Chicago and Chicago Heights in particular. The City also admits substantial evidence demonstrating the necessity of Thresholds' services. For example, the City admits that Thresholds has helped persons who suffer from schizophrenia, bipolar disorder, and major depression, and that one way Thresholds provides services is by establishing group homes where persons with mental illness can live aided by professional staff in a supportive, family-like atmosphere to aid the transition to community living. The City also admits that group

25

homes have a beneficial result to group home residents in general.

Despite this evidence, the City argues that its refusal to grant Thresholds a special use permit merely makes locating in the City more expensive for Thresholds and that Thresholds has no right to demand the exact location on which it may locate. In so arguing, the City states that the FHAA does not "give handicapped persons an unfettered right to demand waivers of facially non-discriminatory zoning ordinances." That may be true, but the ordinance at issue here is facially discriminatory; "family community residence" is defined as a group of no more than eight unrelated persons <u>with disabilities</u>. As such, if the residents of Thresholds did not have disabilities, Thresholds would not be considered to be a "family community residence" and would not be subject to the City's 1,000 foot spacing requirement. For the same reasons, the City's reliance upon <u>Brandt v. Village of Chebanse</u>, 82 F.3d 172 (7th Cir. 1996) and <u>Hemisphere Bldg. Co., Inc. v. Village of Richton Park</u>, 171 F.3d 437 (7th Cir. 1999) is unavailing. In <u>Brandt</u>, the Seventh Circuit held that a city's refusal to allow the plaintiff to build multi-unit housing was not a violation of the FHAA because the zoning ordinance restricting multi-unit housing did not distinguish between disabled and non-disabled persons, and the plaintiff wished to build the units for economic, rather than therapeutic, reasons. <u>Brandt</u>, 82 F.3d at 174. Similarly, in <u>Hemisphere</u>, the Seventh Circuit held that a facially nondiscriminatory maximum density requirement ordinance which merely raises the cost of housing and hurts everyone who would prefer to pay less and forgo whatever benefits the higher cost might confer need not be waived for the handicapped. <u>Hemisphere</u>, 171 F.3d at 440. The Seventh Circuit held that the duty of reasonable accommodation is limited to rules, policies, practices, or services that hurt handicapped people <u>by reason of their handicap</u>, rather than that hurt them solely by virtue of what they have in common with other people, such as a limited amount of

money to spend on housing. Id. at 440. Here, the City's spacing ordinance is of the type that hurts people, including Thresholds' proposed residents, by reason of their handicaps. As such, Brandt and Hemisphere's holdings, that rules which simply make it more expensive for a group to live in a particular dwelling do not violate the FHAA, do not apply to this case.

The City also argues that the Government has not shown that Thresholds' proposed location is necessary vis-a-vis another location. Specifically, the City argues that the Government has not shown that Thresholds' proposed location would ameliorate its residents' disabilities any more than some other location, including the location offered by the City in response to this controversy. The thrust of the City's argument is that the Government bears the burden of demonstrating that Thresholds' particular chosen location at 619 West 15th Street is both reasonable and necessary. While the City is correct that the Seventh Circuit has never expressly held that a handicapped person has an absolute right to the residence that he or she chooses, the remainder of the City's argument is flatly wrong. As this court reasoned in denying the City's motion to dismiss, whether the offer of another parcel of land could ever be considered a reasonable accommodation under the FHAA is doubtful, as the statute makes it unlawful to "make unavailable or deny a dwelling to any buyer or renter because of the handicap of . . . a person intending to reside in that dwelling after it is . . . made available." 42 U.S.C. § 3604(f)(1)(B). The statute thus speaks to the denial of the opportunity to live in particular dwellings, not the denial of housing all together. The Seventh Circuit has expressed scepticism to the City's reading of the statute, noting that the statute refers specifically to inequality of opportunity to live in a dwelling, but has declined to expressly answer the question as to whether a city's providing handicapped housing somewhere within its borders is sufficient to satisfy the statute. Erdman v. City of Ft. Atkinson, 84 F.3d 960, 963 (7th Cir. 1996).

The City argues that such a rule would eliminate a plaintiff's burden of showing that the requested accommodation was reasonable and necessary. That is not the case. In a case such as this, a private plaintiff or the Government will always bear the burden of showing the necessity of a group home in the area in question -- i.e., that the home would ameliorate the effects of disabled persons' disabilities -- and that the request to locate in a given location is reasonable. This court is not holding that all group homes are necessary nor that all requests for spacing variances are reasonable. In contrast, the City's reasoning leads to an untenable result. No court has ever placed the burden on a group home to show that its desired location is necessary or somehow unique in its ability to ameliorate the effects of its residents' disabilities. Rather, courts have interpreted the FHAA to require a showing that the requested accommodation is <u>one way</u> of ameliorating the effects of the disability. See, e.g., <u>Oconomowac Residential Programs, Inc. v. City of Greenfield</u>, 23 F. Supp. 2d 941, 958 (E.D. Wis. 1998) ("[T]he CBRF is one mode of ameliorating [plaintiff's residents'] inability to live independently"). If the City's interpretation of the reasonable accommodation test were the rule, it is doubtful that any group home ever could prevail on a FHAA claim, because there will always be some other parcel of property upon which a comparable residence could be established. Under the City's logic, a city could always prevail by showing that there were other locations available for the home to locate somewhere in the city. However, the FHAA does not only outlaw discrimination in the denial of all housing; it outlaws discrimination in the denial of particular dwellings.

The City has admitted to the ameliorative effects of group homes, and has not disputed that Thresholds would provide such benefits to citizens of the south suburbs and Chicago Heights in particular. The City's offer of another parcel of land or possible presence of other parcels of land

suitable for Thresholds' purposes but not within 1,000 feet of another group home does not make Thresholds' proposed site unecessary. Accordingly, the undisputed facts show that Thresholds' proposed location in the City was necessary is a matter of law.

        b.     <u>Reasonableness of Thresholds' Proposed Accommodation</u>

Under the FHAA, a necessary accommodation is reasonable unless it requires "a fundamental alteration in the nature of a program" or imposes "undue financial and administrative burdens." <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 962 (7th Cir. 1996) (citing <u>Southeastern Community College v. Davis</u>, 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 2369, 2370 (1979)). Determining whether a requested accommodation is reasonable requires, among other things, balancing the needs of the parties involved. <u>Id.</u> at 963. "The requirement of reasonable accommodation does not entail an obligation to do everything humanly possible to accommodate a disabled person; cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." <u>Bronk v. Ineichen</u>, 54 F.3d 425, 429 (7th Cir. 1995). The City argues that granting Thresholds a conditional use permit would require a fundamental alteration in the nature of the zoning program and imposes undue financial burdens on the City.

        i.     <u>Fundamental Alteration of Zoning Program</u>

The Government argues that the special use permit requested by Thresholds was specifically authorized by the 1972 Zoning Code and therefore cannot, as a matter of law and logic, require a fundamental alteration of the City's zoning scheme. The declared purpose of the group home spacing requirement in the 1990 amendments to the 1972 Code was "to prevent clustering of community residences on a block in order to facilitate normalization . . . and preserve the residential character of the neighborhood." To that end, the 1972 Zoning Code's list of "permitted uses" in

single-family residential districts included "family community residences" (group homes), so long as "the community residence is located at least 1,000 feet from any existing community residence, as measured from lot line to lot line, except when a special use permit is issued to allow a community residence to locate closer than 1,000 feet to an existing community residence." As such, the 1972 Zoning Code specifically anticipated and authorized a group home consisting of eight or fewer persons to exist within 1,000 feet of another such home, so long as it obtained a special use permit. The 1972 Zoning Code also allowed for groups of fifteen disabled residents in a single group home to operate in single-family residential neighborhood upon obtaining a special use permit. Here, the two combined homes 500 feet apart would house only thirteen disabled individuals. The City thus contemplated this number and density of disabled persons in its own 1972 Zoning Code.

The City argues that under this logic of looking to the zoning code in question as evidence of the lack of a fundamental alteration, the spacing ordinance will become a nullity, and any home will be permitted to locate wherever it chooses. This court disagrees. Granting a special use permit to allow two group homes to co-exist within 1,000 feet of one another undoubtedly results in an "alteration" of the City's Zoning Code. However, the issue in this litigation, as with every other request for an exemption from a spacing requirement, is and will be whether that alteration is "fundamental." There may be situations in which the distance between the homes is so little, where there is already more than one group home within 1,000 feet, or where the homes are so similar in nature or operation, under which a request for a special use permit would fundamentally alter the City's purpose of avoiding clustering and preserving the residential character of certain neighborhoods.

Here, allowing Thresholds to locate at its chosen location would not undermine the purposes

behind the City's 1972 Zoning Code. First, the undisputed evidence shows that granting the special use permit would not result in the sort of clustering that could prevent disabled persons from integrating into society at large. Second, the undisputed evidence also shows that Thresholds' presence would not change the residential character of the neighborhood in which it seeks to locate.

The Government presented extensive evidence that Thresholds' locating at its proposed location would not result in clustering. The existing home on 14th Place and Thresholds' proposed location are not on the same street, will function separately, and will serve clinically distinct populations who will have little opportunity to interact regardless of the physical distance between them. Thresholds' eight proposed residents have mental illnesses, and will be working, engaged in work training, and going to school. The existing home on 14th Place houses five persons with developmental disabilities who cannot even leave the home unattended. Two of the five residents are non-ambulatory, and four of the five suffer from severe or profound mental retardation. The Government's expert, Dr. Simpatico, found that the location of Thresholds would not create an institutional environment, and that the distance between the two homes "in no way compromises the treatment of either group." It cannot be said that allowing two group homes 500 feet apart but on separate streets, one of which houses only five persons who are generally too disabled to leave their residence, will "fundamentally" alter the City's Zoning Code.

In addition, courts have repeatedly rejected the "anti-clustering" justification for spacing requirements as incompatible with the FHAA, especially where, as here, the burden of the quota falls on the disadvantaged minority. See, e.g., Larkin v. State of Mich. Dept. of Social Servs., 89 F.3d 285, 291 (6th Cir. 1996); Oconomowoc Residential Programs, Inc. v. City of Greenfield, 21 F. Supp. 2d 941, 954 (E.D. Wis. 1998) ("[B]enign intentions on the part of lawmakers cannot justify laws

which discriminate against protected groups."); Children's Alliance v. City of Bellevue, 950 F. Supp. 1491, 1499 (W.D. Wash. 1997) ("Courts should be wary of justifications purporting to help members of the protected class; the court should assess whether the benefits of the requirement 'clearly' outweigh the burdens."). As the Sixth Circuit reasoned in Larkin, the FHAA protects the right of individuals to live in the residence of their choice in the community. If the state were allowed to impose quotas on the number of minorities who could move into a neighborhood in the name of integration, this right would be vitiated. Larkin, 89 F.3d at 291.

The one court which has upheld an anti-clustering justification of a spacing requirement is Familystyle of St. Paul, Inc. v. City of St. Paul, 923 F.2d 91 (8th Cir. 1991), upon which the City relies heavily. In that case, the plaintiff attacked a anti-clustering ordinance on its face, arguing that it was invalid because it limited housing choices of the mentally handicapped and therefore conflicted with the language and purpose of the FHAA. Id. at 94. Here, the government does not challenge the City's spacing ordinance on its face, but rather how it is applied to Thresholds. Moreover, the plaintiff in Familystyle sought to add three new group homes to its eighteen existing group homes located on a single campus, yielding a total of twenty-one group homes housing 130 persons with mental illness within an area of one and one-half blocks. See id. at 92. The Eighth Circuit found that it had been given no reason to believe that the group home was incapable of dispersing its group homes and integrating its clients into the community, such that the goal of deinstitutionalization remained valid. Id. at 95. Here, there is no evidence that Thresholds' location would result in institutionalization, and the purpose of Thresholds' request is precisely to integrate into the community. Moreover, even if Familystyle's reasoning did apply here, it is of little weight. It was decided in 1991, shortly after the enactment of the FHAA. Subsequent decisions, including

two courts of appeal, have expressly rejected Familystyle's analysis. See Bangerter v. Orem City Corp., 46 F.3d 1491, 1503 (10th Cir. 1995); Larkin, 89 F.3d at 290.

In response to the Government's facts and law, the City presented no evidence that granting the special use permit would result in "clustering" -- i.e., that those burdened by the ordinance would actually benefit from it.[4] Instead, the City defends its decision on the idea that allowing this special use permit would create a precedent such that clustering would become a problem, and that a 50% reduction of the dispersal requirement (i.e., within less than 500 feet of another group home under a 1,000 foot spacing requirement) is, by definition, "fundamental." Both of the City's arguments are easily disposed of.

First, as noted, the only "precedent" set by this case is that the City must do what is required of it under the FHAA, including granting special use permits when such an action is reasonable. Whether future special use permits are reasonable and necessary will depend on the individual particular factual circumstances of the request. See e.g., Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1104 (3rd Cir. 1996) ("The reasonable accommodation inquiry is highly fact-specific, requiring a case-by-case determination."). Morever, strict adherence to a rule on the basis that otherwise the "foot will be in the door" to other group homes is not a sufficient basis upon which to deny a permit. See United States v. Village of Marshall, 787 F. Supp. 872, 879 (W.D. Wis. 1991) ("The public comments of the Board members concerning their concern that a subsequent additional community-based residential facility would be sought were not relevant to its determination of the

---

[4] Importantly, the City offered no such evidence either to this court in response to the Government's motion for summary judgment nor in the ZBA, Planning Commission, or City Council's decisions to deny the permit, despite being required by City law to make written factual findings of the reasons for the decision.

33

present facility."). In <u>Village of Marshall</u>, as here, there was no evidence presented that two relatively small group facilities would create the type of density which the legislature sought to avoid. <u>Id.</u> The court noted that the FHAA will require that changes be made to traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling. <u>See id.</u>

The City cites <u>Hemisphere Bldg. Co., Inc. v. Village of Richton Park</u>, 171 F.3d 437 (7th Cir. 1999) for the proposition that a municipality can be "chintzy" and demand strict adherence to its zoning ordinances. In that case, the Seventh Circuit held that a municipality is not required to step on to a "slippery slope" by allowing piecemeal rezoning is that paves the way for further requests for rezoning, until the land-use plan that generated the zoning is completely eroded. <u>Id.</u> at 439. However, as discussed above, <u>Hemisphere</u> involved a facially neutral ordinance, unlike the one involved here, and the Seventh Circuit noted that the density requirement had "nothing to do with hostility to handicapped people." <u>Id.</u> The law is clear that municipalities may not be so "chintzy" when dealing with facially discriminatory zoning laws.

Second, the size of the requested waiver alone cannot determine whether it would result in a "fundamental alteration" of a zoning code. The City has cited no case which suggests that the size of the requested variance has anything to do with whether granting the permit would result in a "fundamental alteration" of the zoning scheme, and none of the cases cited by either the City or the Government mention the size of the waiver in determining whether it would result in a "fundamental alteration." The courts' lack of focus on the size of the waiver makes sense, given that the test for reasonableness in the Seventh Circuit speaks to the fundamental alteration of the zoning program <u>as a whole</u>, not of one particular area.

34

The City also admitted that granting Thresholds' request would not alter the residential character of the neighborhood. The City's corporation counsel and Rule 30(b)(6) designee on the reasonable accommodation issue, August Anzelmo, admitted that granting Thresholds' request would not alter the residential character of the neighborhood. Instead, Anezelo admitted that the only burdens the City feared in rejecting the permit were administrative and financial. Those admissions are binding on the City

In sum, while granting Thresholds' permit request would result in some alteration of the City's zoning scheme, the alteration would not be fundamental. The FHAA attempts to strike a balance between municipalities' interests in proper zoning and disabled persons' ability to live where they choose by requiring municipalities to bend their rules, so long as the bending does not fundamentally alter the zoning scheme. The City has presented no evidence that allowing Thresholds to locate on its proposed location would undermine that balance by resulting in a fundamental alteration of its zoning scheme.

### ii. Undue Financial and Administrative Burdens

In responding to the Government's motion for summary judgment, the City "combined" its response to the "fundamental alteration" argument and the "undue financial burden" argument. Anzelmo, the City's Rule 30(b)(6) designee on the reasonable accommodation issue, testified that the requested accommodation would not cause any of the specific problems identified in the City's Zoning Code as reasons for denying special use permits. Specifically, Anezelo testified that the requested accommodation would not pose any threat or danger to public health, would not interfere with the neighbors using and enjoying their property, would not substantially diminish or impair property values in the vicinity, would not impede development or surrounding properties, would not

pose problems of inadequate utilities, would not pose problems with respect to ingress, egress, or parking, and would not cause more vehicular traffic than a single family home.

In essence, the City argues that the precedent which would be created by granting Thresholds' special use permit would create financial and administrative burdens in the form of increased litigation costs stemming from other group home providers seeking special use permits. This argument is merely a restatement of the City's "slippery slope" or "impermissible precedent" argument which this court has already rejected. Because the City offers no evidence of other financial or administrative burdens, and because the City's Zoning Code plainly allows for special use permits for group homes to operate within 1,000 feet of another home, it cannot be said that granting Thresholds' request would result in any undue financial or administrative burdens. The cost of complying with the FHAA is not "undue."

c.    <u>Benefit vs. Burden of Requested Accommodation</u>

For all the reasons outlined above, the cost to the City of granting Thresholds' proposed accommodation, if any, is negligible. The benefits to the proposed residents of Thresholds, on the other hand, are many. As demonstrated by the deposition testimony of Dr. Simpatico and as recognized by Seventh Circuit case law, the benefits of group homes to disabled persons are numerous. In addition, Thresholds purchased the property and invested time and effort in preparing to build a group home at its chosen site only after being informed by the City that the location was properly zoned for group homes. Granting a special use permit would ensure that the money Thresholds has already expended is not wasted, and that Thresholds need not incur additional costs

to secure a different site.[5] As such, the benefits of granting the special use permit to Thresholds and its residents far outweigh the costs to the City.

### 3. The City's Offer of Another Parcel of Land

The City contends that its offer to exchange Thresholds' 619 West 15th Street property for a parcel of land elsewhere in the City was per se a reasonable accommodation. This argument is a restatement of the City's argument that the Government has not shown that the 15th Street property was necessary vis-a-vis some other parcel of land. As stated above, however, the FHAA speaks to and protects disabled persons' equal opportunity to use and enjoy "a" dwelling. See Sec. II.A.2.a, infra; 42 U.S.C. § 3604(f)(3)(B). The legislative history of the Act supports the focus on disabled persons' right to live in particular dwellings, stating that the Act is intended to protect the ability of the disabled to live in "the residence of their choice." 1988 U.S.C.C.A.N. 2173, 2185. And again, as cited above, the Seventh Circuit has supported an interpretation that the FHAA protects disabled persons' right to live in the dwelling of their choice, not some property within the community. See Erdman v. City of Ft. Atkinson, 84 F.3d 960, 963 (7th Cir. 1996). The City offers no evidence that the alternate parcel of land would better serve Thresholds' residents or is otherwise more

---

[5]The City argues that the requested accommodation was somehow unreasonable because Thresholds did not present extensive evidence of the benefits of the home to the Zoning Board and the City Council. Thresholds did, however, present evidence of the benefits of the home to the ZBA and the Planning Commission, who nonetheless denied the permit without providing written reasons for the denial, as required by the City's own law. The City Council likewise acted on the ZBA and Planning Commission's advice despite not knowing the reasons for the ZBA and Planning Commission's recommendations and did not invite Thresholds to make a presentation to the City Council. Thresholds was informed by the City that the property was properly zoned for a group home and had no duty to inform the City that it intended to go forth with its project. Thresholds had no way of knowing that it might require a special use permit before being informed by the City that there was another group home within 1,000 feet of its proposed location. As such, Thresholds in no way "sat on its rights" such that its request was unreasonable.

"reasonable" or "necessary" than Thresholds' proposed location. In contrast, Thresholds presented evidence that a change of site would delay the opening of the home due to the HUD funding process, based on prior experience with a similar land swap in the City of Chicago. For these reasons, the City's offer of another piece of land does not constitute a reasonable accommodation under the undisputed facts.

4. <u>Conclusion Regarding City's Refusal to Allow Thresholds to Locate at its Desired Location</u>

For all the reasons stated, the City violated the FHAA by refusing to allow Thresholds to locate on its property at 619 West 15th Street. Thresholds is entitled to locate at 619 West 15th Street as a matter of right because there is no other "family community residence" within 1,000 feet of the proposed site. The residence alleged by the City to be a "family community residence" is actually a "family" within the meaning of the City's 1972 Zoning Code. Even if Thresholds is within 1,000 feet of an existing "family community residence," however, the City is required to make a reasonable accommodation in its zoning laws to allow Thresholds' proposed residents to locate in the dwelling of their choice. The City failed to make such a reasonable accommodation by refusing to grant Thresholds a special use permit to locate within 1,000 feet of the existing family community residence. The special use permit is both necessary to ameliorate Thresholds' proposed residents' disabilities and reasonable because it will not result in a fundamental alteration of the City's zoning scheme nor cause the City undue financial or administrative burdens. Based upon the undisputed facts, the Government's motion for summary judgment on its reasonable accommodation claim must be granted.

B.     The City's 1998 Zoning Code

In addition to the Government's challenge to the City's refusal to allow Thresholds to locate at its desired location, the City also argues the City's 1998 Zoning Code, enacted on December 21, 1998, the same day the City Council voted to deny Thresholds' special use permit, violates the FHAA. The Government challenges the following provisions of the Zoning Code, which all apply only to the group homes of eight or fewer persons who require assistance or supervision in day-to-day living: (1) that group homes "occupy a detached single-family dwelling"; (2) that group homes "be operated by a government, religious or other non-profit entity"; (3) that group homes "occupancy shall not exceed one person per room"; and (4) that group homes undergo inspections not required of any other residential properties.

The City opposes this motion on the basis that the Government does not have standing to challenge the 1998 Zoning Code and that the ordinance "does not discriminate on its face against group homes." In so arguing, the City mis-states the law of Government standing under the FHAA, citing standards which apply to private plaintiff standing. While the City frames its argument in terms of standing, it is really arguing that the controversy with regard to the 1998 Zoning Ordinance is not ripe for adjudication because Thresholds has not approached the City to make an application under the 1998 Zoning Code and the Government has not shown that such an application would have been denied.[6]

Contrary to the City's argument, the Government does have explicit statutory standing to

---

[6]The 1998 Zoning Code, like the 1972 Zoning Code, restricts group homes from locating within 1,000 feet of one another. There is thus no reason to believe that Thresholds' application for a special use permit would have been granted under the 1998 Zoning Code.

challenge the 1998 Zoning Code. The FHAA provides: "(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter . . . the Attorney General may commence a civil action in any appropriate United States district court." 42 U.S.C. § 3614(a). The Attorney General may demonstrate the existence of a "pattern or practice" of discrimination by showing the existence of a discriminatory policy alone. United States v. City of Parma, 494 F. Supp. 1049, 1095 (N.D. Ohio 1980). Moreover, a plaintiff may have standing to challenge a zoning ordinance even if it has not yet been subject to the actual enforcement of that ordinance. See Marbrunak, Inc. v. City of Stow, Ohio, 974 F.2d 43, 46 (6th Cir. 1992). The Attorney General also has statutory standing to bring suit under the FHAA when he has reasonable cause to believe that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

Here, the Government has alleged and supported both types of statutory standing. Contrary to the City's assertion, the 1998 Ordinance is facially discriminatory. On the face of the Code, different standards apply to group homes than to families and other groups living together. As the Seventh Circuit has noted, there are many zoning procedures which are impermissible under the Act either as written or as applied. United States v. Village of Palatine, 37 F.3d 1230, 1234 (7th Cir. 1994) (citing Marbrunak, 974 F.2d at 46). Statutes that single out for regulation group homes for the handicapped are facially discriminatory. Larkin v. Mich. Dept. of Social Servs., 89 F.3d 285, 290 (6th Cir. 1996). As such, the Attorney General had reasonable cause to believe that the City was engaged in a "pattern or practice" of discrimination by virtue of enacting the 1998 Zoning Code alone. The Attorney General also had reasonable cause to believe that Thresholds' proposed

residents had been denied rights under the FHAA and that the denial, together with the enactment of the 1998 Zoning Code, raised an issue of general public importance.

Courts have differed in the level of scrutiny they apply to facially discriminatory statutes. The Eighth Circuit has ruled that statutes which discriminate on their face against disabled persons are subject to a rational basis scrutiny, i.e., they will be upheld if they are rationally related to a legitimate government objective.  See Familystyle of St. Paul, Inc. v. City of St. Paul, 923 F.2d 91, 94 (8th Cir. 1991).  The Sixth and Tenth Circuits have subjected such statutes to a higher form of scrutiny, reasoning that "in order for facially discriminatory statutes to survive a challenge under the FHAA, the defendant must demonstrate that they are warranted by the unique and specific needs and abilities of those handicapped persons to whom the regulations apply."  Larkin, 89 F.3d at 290; see also Bangerter v. Orem City Corp., 46 F.3d 1491, 1503-04 (10th Cir. 1995).  The Seventh Circuit has never articulated a standard under which to assess such statutes, but has stated that "a procedure may not be required only of the handicapped but not of other people."  Village of Palatine, 37 F.3d at 1234.  Given that admonition, this court believes that the Sixth and Tenth Circuits' tests for facially discriminatory laws are more in line with the language and purposes of the FHAA than the test employed by the Eighth Circuit.  Accordingly, the challenged portions of the City's 1998 Zoning Code cannot survive unless they are warranted by the specific needs and abilities of those handicapped persons to whom they apply.

1.    Challenged Portions of 1998 Zoning Code

The City placed its eggs almost entirely in the standing argument, and makes only a half-hearted attempt at defending the provisions of the 1998 Zoning Code challenged by the Government. In addressing each of the challenged provisions, the City did not put forth any evidence nor attempt

to argue that the provisions are somehow tailored to the needs of disabled persons. Instead, the City's response boils down to generalizations about disabled persons. In the end, the City does not raise a genuine dispute that any of the four challenged provisions are warranted by the specific needs and abilities of the persons to whom they apply.

a.   Detached Single-Family Dwelling Requirement

The 1998 Zoning Code requires that group homes "occupy a detached single-family dwelling, which is consistent in type and general outward appearance with other residences in the area where it is located." Despite recognizing that group homes are the functional equivalents of families, the 1998 Zoning Code limits the type of structure that group homes, but not other families, may occupy. The provision also has the effect of excluding group homes from locating anywhere but in single-family areas of the City, because the single-family dwellings must be consistent in type and outward appearance to other residences in the area.

Under the 1998 Zoning Code, families and groups of non-disabled unrelated persons living in the City may occupy duplexes, town homes, and apartment buildings and are not restricted to single-family neighborhoods. The City has proffered no evidence to demonstrate that there is something unique about disabled persons that justifies limiting their choice of dwelling types or neighborhoods, and common sense shows that there is none. There is nothing about the outward appearance of a group home that is tailored to that home's ability to serve its clients' needs. The City's argument that "group homes" should be required to look like "homes" is ridiculous. "Homes" do not only "look like" single-family detached residences. They also look like apartments, town homes, duplexes, and other dwellings. As such, the detached single-family requirement violates the FHAA.

### b.   Non-Profit Provider Requirement

The 1998 Zoning Code also contains a requirement that "the facility shall be operated by a governmental, religious, or other non-profit agency." Under this section, for-profit providers are barred from locating group homes anywhere in the City as a permitted use. This limitation on ownership applies only to group homes. The Sixth Circuit rejected a law which limited the number of residents for-profit providers could house in a group home but did not limit the number of residents non-profit providers could house. See Smith & Lee Associates, Inc. v. City of Taylor, 102 F.3d 781, 796 (6th Cir. 1996) (finding that occupancy limit on for-profit group homes serving the elderly disabled guarantees a negligible or negative rate of return for investors, such that demand outstripped the existing supply of such homes and there would not be sufficient housing for the disabled residents in the city). Here, the City has enacted a far more restrictive complete ban on for-profit providers. In defense of that action, the City merely argues that "it is not a violation of the FHA[A] for the City to require that group home providers should not profit from the handicapped people they are attempting to serve." The FHAA does not require group home providers to give away their services, to operate at a loss, nor to declare a particular tax status. If it did, there would be far fewer residences for disabled persons than there presently are. The City points to no evidence that for-profit group home providers are any less adept at providing care for disabled individuals than their non-profit equivalents. As such, the City has failed to present a genuine dispute that the ban on for-profit providers is tailored to the specific needs of disabled individuals.

### c.   One Person Per Room Requirement

The 1998 Zoning Code provides that "occupancy shall not exceed one person per room." Nowhere in the Code is the one-person-per-room restriction applied to persons without disabilities.

In defense of this provision, the City states only that "there is nothing improper about not allowing group home operators to place their residents in cramped conditions." That may be true, but the 1998 Code does not speak to cramped conditions. Rather, for example, two disabled persons sharing a massive room would violate the 1998 Zoning Code, while eight siblings or five unrelated individuals sharing a tiny room would not. Common sense suggests that some disabled persons may even benefit from sharing a room with another disabled individual. The City points to no evidence of the specific needs of disabled individuals to support such a draconian facially discriminatory maximum density requirement.

### d. Inspection Requirements

The 1998 Code requires "[a]n inspection by the code enforcement department ensures that existing building code requirements for residences are met prior to any occupancy or re-occupancy." The Code does not require this type of inspection for any other residential use. Cities are permitted to enact laws for the purpose of protecting health and safety of its residents. However, those types of laws are legitimate only in that they "ordinarily apply uniformly to all residents of all dwelling units." City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 732, 115 S.Ct. 1776, 1781 (1995). Here, the "health and safety" ordinance enacted by the City applies only to disabled persons, and is in no way tied to their particular needs. As noted by the Government, group homes are operated by providers who must be licensed, and are operated by non-disabled personnel whose function it is to protect the health and safety of the residents. The City has presented no evidence that disabled persons are more likely to move into unsafe dwellings, and thus is not tailored to the needs of disabled persons.

2.    Variance Procedures

The City takes the position that, whatever flaws the 1998 Zoning Code may contain, group homes that do not meet its requirements can apply for a reasonable accommodations through the variance procedure in the 1998 Code. However, the express language of the FHAA states that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 24 U.S.C. § 3615. In Marbrunak, Inc. v. City of Stow, 974 F.2d 43 (6th Cir. 1992), the Sixth Circuit rejected a city's argument that an ordinance was not facially discriminatory because it could be tailored to the individual needs of the residents through the variance procedures. "[T]he variance procedure provided by the city's zoning code cannot be said to save the ordinance by satisfactorily individualizing its safety requirements to the needs and abilities of the residents of plaintiff's home." Id. at 48. Similarly, here the City has offered no guidelines by which a request for a variance would be granted, and the Code places the burden on disabled individuals to apply for variances under a facially discriminatory law. Regardless of the availability of variances, the four challenged provisions of the 1998 Zoning Code violate the FHAA on their face.

For all the reasons stated, the four challenged provisions of the City's 1998 Zoning Code violate the FHAA on their face, and therefore must be enjoined. The Government's motion for summary judgment on its claim that the 1998 Zoning Code violates the FHAA is granted. The City is therefore enjoined from enforcing the following provisions of the 1998 Zoning Code: (1) that group homes "occupy a detached single-family dwelling"; (2) that group homes "be operated by a government, religious or other non-profit entity"; (3) that group homes "occupancy shall not exceed one person per room"; and (4) that group homes undergo inspections not required of any other

45

residential properties.

III.  The City's Motion for Summary Judgment on the Government's Intentional Discrimination Claim

The City filed a cross-motion for summary judgment on the Government's reasonable accommodation claim and the Government's challenge to the City's 1998 Zoning Code. However, for all the reasons stated above, this court is granting the Government's motion for summary judgment on those claims. Accordingly, the City's motion for summary judgment on those two claims is denied. The City also moved for summary judgment on the Government's intentional discrimination claim, arguing that the Government has presented no admissible evidence that the City's decision-makers were driven by a discriminatory motive.

Contrary to the City's argument, the Government has presented extensive evidence, both direct and circumstantial, that the City's decision-makers were driven by discriminatory motives in voting to deny Thresholds' special use permit. The Seventh Circuit has repeatedly held that, due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment. See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc., 991 F.2d 1249, 1258 (7th Cir. 1993). In light of this standard, the Government has come forward with more than sufficient evidence to create a genuine dispute as to whether the City acted with discriminatory animus in voting to reject Thresholds' special use permit. The City's failure to make any written factual findings or statement of reasons for denying the permit, despite being required by its own law to do so, and the substantial community opposition voiced to the City alone are sufficient to raise a genuine dispute on this issue. Accordingly, the City's motion for summary judgment on the Government's intentional

discrimination claim must be denied.

## CONCLUSION

For all the reasons stated, the City's motion to strike is DENIED. The Government's motion for partial summary judgment is GRANTED. The City's motion for summary judgment is DENIED in its entirety. Judgment is granted in favor of the Government on its reasonable accommodation claim and on its challenge to the City's 1998 Zoning Code. This court finds that the City violated the FHAA by failing to reasonably accommodate Thresholds, and the certain provisions of the 1998 Zoning Code violate the FHAA. The Government has conceded that a decision by this court that the City has unlawfully prevented Thresholds from building its group home obviates the need for a ruling on the United States' claim of intentional discrimination, and has requested that this court enjoin the City from enforcing the facially unlawful requirements for group homes in its 1998 Zoning Code. The City is thus enjoined from enforcing those four provisions of the 1998 Zoning Code, as outlined in this courts order. The City is also permanently enjoined from forbidding Thresholds to build its group home at its desired location, 619 West 15th Street in the City of Chicago Heights. There being no just reason for delay, the clerk is directed to enter judgment in favor of plaintiff the United States of America and against the City of Chicago Heights on the Government's claims for injunctive and declaratory relief. This case is set for report on status on April 24, 2001 at 9:00 a.m.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
United States District Judge

DATE: March 20, 2001

47